IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IAN HARKER, CORRANDINA | ) | |
| BALDACCHINO, and GH, a minor, | ) | CIVIL ACTION NO. 3:15-CV-277 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | JUDGE KIM R. GIBSON |
| v. | ) | |
| | ) | |
| JOHN O. CHAN, M.D., and | ) | |
| CONEMAUGH MEMORIAL MEDICAL | ) | |
| CENTER, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

### I. Introduction

Plaintiffs sued Dr. John O. Chan and Conemaugh Memorial Medical Center ("Conemaugh") for medical malpractice. (*See* ECF No. 1.) Plaintiffs alleged that Dr. Chan negligently treated GH, their newly-born daughter, by wrapping her head tightly with an ACE bandage shortly after birth, causing her to suffer permanent disfigurement to her head and scalp. (*Id.*) Defendants denied liability.

The case proceeded to trial, resulting in a jury verdict for Plaintiffs. (ECF No. 72). The jury awarded Plaintiffs over $47,000,000—$43,750,000 for past and future non-economic damages[1] and $3,283,579 in future medical expenses.[2]

---

[1] GH's non-economic damages comprised "pain and suffering, embarrassment and humiliation, loss of ability to enjoy the pleasure of life, and disfigurement." (ECF No. 72.) The Court will refer to this aspect of the jury award as "compensatory damages" throughout this Memorandum Opinion.

[2] The parties stipulated to the cost of future medical expenses and moved their stipulation into evidence. (*See* ECF No. 84-6.)

Dr. Chan and Conemaugh filed a Motion for Post-Trial Relief (ECF No. 77). Defendants move for a new trial or, in the alternative, for remittitur of the jury's verdict. (*Id.*) The Motion has been fully briefed (*see* ECF Nos. 86, 88, 91, 94) and is ripe for disposition.

For the reasons that follow, the Court will **GRANT in PART, and DENY in PART,** Defendants' Motion. The Court **DENIES** Defendants' request for a new trial. **But the Court GRANTS the Defendants' request for remittitur, and remits $27,750,000 of the compensatory damage award, resulting in a compensatory damage award of $16,000,000 and an overall verdict of $19,283,579.**[3] The reduced compensatory damage award of $16,000,000 represents "the highest possible recovery that would not 'shock the judicial conscience.'" *Dee v. Borough of Dunmore*, 474 F. App'x 85, 88 (3d Cir. 2012) (internal citation omitted); *Evans v. Port Auth. of N.Y. & N.J.*, 273 F.3d 346, 355 (3d Cir. 2001) (internal citation omitted) (holding that "remittitur should be set at the 'maximum recovery' that does not shock the judicial conscience.").

As stated in the order following this Memorandum Opinion, Plaintiffs shall have **fourteen days** to accept the reduced award or opt for a new trial on damages. *See Cortez v. Trans Union, LLC*, 617 F.3d 688, 716 (3d Cir. 2010) ("[A] court must afford a plaintiff the option of a new trial when it attempts to reduce a jury award because it believes the amount of the verdict is not supported by the evidence.").

---

[3] As explained in *supra* note 2, the parties stipulated to the cost of future medical expenses and moved their stipulation into evidence. The Court does not disturb this stipulated economic damage award.

## II. Background

GH was born at Conemaugh on December 27, 2012.[4] Because she was premature, she was brought to the neonatal intensive care unit and placed under the care of Dr. Chan.[5]

Dr. Chan observed minimal swelling on GH's head, a normal finding for a newborn baby.[6] Dr. Chan believed that the swelling was either a caput, a cephalohematoma, or a subgaleal hemorrhage.[7] The standard treatment for these conditions is either observation—in the case of caput[8] and cephalohematoma[9]—or observation and, if necessary, blood transfusion, in the case of subgaleal hemorrhage.[10] However, Dr. Chan directed his nurse to wrap GH's head with an ACE bandage,[11] a treatment that Dr. Chan learned while in medical school in the Philippines in the 1980s.[12] The nurse applied an ACE bandage wrap to GH's head around 1:00 p.m. on December 27.[13] The wrap remained on GH's head until 11:00 a.m. on December 29.[14] By the time a nurse removed the ACE bandage wrap, GH's head was bruised and swollen,[15] and had abrasions that were oozing blood and serum.[16] Both sides of GH's head, "all the way around," were discolored due to eschar.[17]

---

[4] Testimony of Dr. John O. Chan, ECF No. 81 at 51.

[5] *Id.* at 52.

[6] *Id.* at 53-54.

[7] *Id.* at 54.

[8] *Id.* at 57.

[9] *Id.*

[10] *Id.* at 57-58.

[11] *Id.* at 65.

[12] *Id.* at 72-73.

[13] *Id.* at 67.

[14] *Id.* at 84.

[15] *Id.* at 80-85.

[16] *Id.* at 82-85.

[17] *Id.* at 87. According to Dr. Laura Monson, M.D., one of Plaintiffs' experts, "eschar" is "black necrotic tissue." (Testimony of Dr. Monson, ECF No. 82 at 26.)

GH was transferred to Texas Children's Hospital in Houston, Texas.[18] After arriving at Texas Children's, GH was treated by Dr. Laura Monson, a pediatric plastic and craniofacial surgeon.[19] Dr. Monson noted "significant soft tissue loss" on GH's head and substantial hair loss.[20] Fat oozed out of her scalp.[21] Her skull bone was also compromised.[22] To treat GH's injuries, Dr. Monson peeled away the dead tissue from GH's scalp, in a process called "debridement."[23] This painful peeling procedure took place over several days.[24]

Around February 6, 2013, GH was discharged from Texas Children's.[25] But her medical treatment did not end when she left the hospital. GH immediately began physical therapy for wound care.[26] In 2017, GH underwent reconstructive surgery of her scalp, which entailed placing a tissue expander underneath her skin.[27] This reconstructive surgery has dual goals: to grow new skin to replace the damaged skin—which will decrease the likelihood of infection—and to stretch the hair-growing skin to recreate a hairline across GH's forehead.[28] The tissue expanders limit GH's activities and require that GH's head remain covered when GH goes outside in the sun.[29] If no complications arise, GH will have tissue expanders in her head for three more years, but Dr. Monson expects complications and testified that GH may have tissue expanders for five or even

_____

[18] *Id.* at 13-20.
[19] *Id.* at 9.
[20] *Id.* at 31.
[21] *Id.* at 34.
[22] *Id.* at 32.
[23] *Id.* at 31-36.
[24] *Id.* at 35.
[25] *Id.* at 36.
[26] *Id.* at 38.
[27] *Id.* at 45-46.
[28] *Id.* at 39-41.
[29] *Id.* at 53.

ten more years.[30] In either event, GH will require additional surgeries, multiple hospitalizations, and countless visits to the hospital.[31] She may also need a bone graft.[32] And despite her doctors' best efforts, GH will be permanently disfigured.[33]

GH has also suffered emotional distress; she is aware that she is "different" and has been teased by other children.[34] She will require psychological counseling as she ages and becomes increasingly aware of her disfigurement.[35]

## III. The Court Will Deny Defendants' Motion for a New Trial Because a Reasonable Jury Could Not Have Found for Defendants on the Question of Liability

Defendants argue that the Court should vacate the jury verdict and order a new jury trial on all issues because the Court erred in granting Plaintiffs' Motion for Judgment as a Matter of Law on the issue of liability. (*See* ECF No. 86 at 14.) Defendants contend that the Court erred for two reasons; first because a reasonable jury could have found that Dr. Chan did not violate the standard of care (*id.* at 15) and, second, because a reasonable jury could have concluded that Dr. Chan's treatment did not cause GH's injuries. (*Id.* at 18.) The Court rejects both arguments.

### A. Legal Standards

#### 1. Motion for Judgment as a Matter of Law

Rule 50 of the Federal Rules of Civil Procedure provides that:

If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:

---

[30] *Id.* at 51-52.

[31] *Id.* at 57.

[32] *Id.* at 56,

[33] *Id.* at 64.

[34] Testimony of Corradina Baldacchino, ECF No. 82, 92-96; Testimony of Ian Harker, ECF No. 82, 77-78.

[35] Testimony of Dr. Monson, ECF No. 82 at 57-58.

(A) resolve the issue against the party; and

(B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50.

A court should grant a motion for judgment as a matter of law only if "'there is no legally sufficient basis for a reasonable jury' to find in favor of the non-moving party. In making this determination, the District Court 'must draw all reasonable inferences in favor of the non-moving party, and it may not make credibility determinations or waive evidence.'" *Sullivan v. Cty. of Allegheny, Pa.*, 112 F. App'x 176, 178 (3d Cir. 2004) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000)); *see Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 249 (3d Cir. 2001) (internal quotation marks omitted) (quoting *Powell v. J.T. Posey Co.*, 766 F.2d 131, 133-34 (3d Cir. 1985)) (stating that a court should grant a motion for judgment as a matter of law "only if, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief."). When deciding a motion for judgment as a matter of law, a district court "must refrain from weighing the evidence, determining the credibility of witnesses, or substituting [its] own version of the facts for that of the jury." *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)).

Still, "[f]ederal courts do not follow the rule that a scintilla of evidence is enough" to defeat a motion for judgment as a matter of law. *Sullivan*, 112 F. App'x at 178 (citing *Walter v. Holiday Inns, Inc.*, 985 F.2d 1232, 1238 (3d Cir. 1993)). As the Third Circuit has repeatedly held, "[t]he question is not whether there is literally no evidence supporting the party against whom the

motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Id.* at 178 (quoting *Walter*, 985 F.2d at 1238); *Foster v. Nat'l Fuel Gas Co.*, 316 F.3d 424, 428 (3d Cir. 2003) (quoting *Walter*, 985 F.2d at 1238); *Vincler & Knoll v. Paul*, 54 F. App'x 66, 68 (3d Cir. 2002) (quoting *Walter*, 985 F.2d at 1238); *Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488, 493 (3d Cir. 2002) (quoting *Patzig v. O'Neil*, 577 F.2d 841, 846 (3d Cir. 1978)).

## 2. Medical Malpractice

"Medical malpractice consists of a negligent or unskillful performance by a physician of the duties which are devolved and incumbent upon him on account of his relations with his patients, or of a want of proper care and skill in the performance of a professional act." *Quinby v. Plumsteadville Family Practice, Inc.*, 907 A.2d 1061, 1070 (Pa. 2006) (citing *Mutual Ben. Ins. Co. v. Haver*, 725 A.2d 743 (Pa. 1999)).

To establish medical malpractice under Pennsylvania law, a plaintiff must establish "(1) a duty owed by the physician to the patient[;] (2) a breach of duty from the physician to the patient[;] (3) that the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient[;] and (4) damages suffered by the patient that were a direct result of that harm." *Thierfelder v. Wolfert*, 52 A.3d 1251, 1264 (Pa. 2012) (quoting *Mitzelfelt v. Kamrin*, 584 A.2d 888, 891 (Pa. 1990)); *see Aughenbaugh v. DeJulia*, No. 3:09-CV-159, 2013 WL 12293453, at *15 (W.D. Pa. Mar. 27, 2013) (Gibson, J.) (quoting *Kamrin*, 584 A.2d at 891). "With all but the most self-evident medical malpractice actions there is also the added requirement that the plaintiff must provide a medical expert who will testify as to the elements of duty, breach, and causation." *Quinby*, 907 A.2d at 1070-71 (citing *Hightower–Warren v. Silk*, 698 A.2d 52, 54 (Pa. 1997)).

-7-

To prove the first two elements—duty and breach—"the plaintiff must show 'that the act of the physicians or hospital fell below the standard of care' owed to the plaintiff as a patient." *Thierfelder*, 52 A.3d at 1264 (quoting *Brannan v. Lankenau Hosp.*, 417 A.2d 196, 199 (Pa. 1980)). The Supreme Court of Pennsylvania has repeatedly held that to comply with the standard of care, a physician must treat a patient with "the skill and knowledge usually possessed by physicians in the same or a similar locality, giving due regard to the advanced state of the profession at the time of the treatment; and in employing the required skill and knowledge he is also required to exercise the care and judgment of a reasonable [person]." *Thierfelder*, 52 A.3d at 1265 (quoting *Donaldson v. Maffucci*, 156 A.2d 835, 838 (Pa. 1959)).

The third element—proximate causation—"is a term of art, and may be established by evidence that a defendant's negligent act or failure to act was a substantial factor in bringing about the harm inflicted upon a plaintiff." *Jones v. Montefiore Hosp.*, 431 A.2d 920, 923 (Pa. 1981); *Hamil v. Bashline*, 392 A.2d 1280, 1284 (Pa. 1978).

## B.     A Reasonable Jury Could Not Have Found that Dr. Chan Met the Standard of Care

Defendants acknowledge that Dr. Chan owed GH a duty of care. (ECF No. 86 at 17.) But they contend that a reasonable jury could have concluded that Dr. Chan did not violate the standard of care in his treatment of GH. (ECF No. 86 at 16.) First, they argue that a reasonable jury could have found that Dr. Chan acted properly in diagnosing GH with a subgaleal hemorrhage because, though the radiologist's report did not indicate any signs of a subgaleal hemorrhage—the radiologist diagnosed GH with a cephalohematoma[36]—Dr. Chan diagnosed

---

[36] Testimony of Dr. John Chan, ECF No. 81 at 63.

GH with a subgaleal hemorrhage based on his own clinical evaluation. (*Id.*) They argue that this diagnosis is consistent with Dr. Chan's testimony that a subgaleal hemorrhage can develop spontaneously, and thus supports a determination that Dr. Chan acted reasonably. (*Id.*) Second, they argue that a reasonable jury could have found that Dr. Chan did not violate the standard of care when he treated what he thought was a subgaleal hemorrhage with an ACE bandage wrap around GH's scalp. (*Id.*) Defendants note that Dr. Chan learned the ACE bandage treatment for a subgaleal hemorrhage in medical school and previously used it several times without incident. (*Id.* at 17.) They also note that no literature or practice guidelines expressly prohibit using an ACE bandage wrap to treat a subgaleal hemorrhage. (*Id.*)

In response, Plaintiffs argue that no reasonable jury could have found that Dr. Chan met the standard of care. (*See* ECF No. 88 at 7-9.) They argue that they presented unrebutted expert testimony from Dr. Victoria Niklas, M.D., that Dr. Chan's treatment of GH fell below the standard of care. (*Id.* at 7.) They contend that they offered undisputed expert testimony that the standard of care for treating a subgaleal hemorrhage is to observe and, if necessary, treat with blood transfusions, and that wrapping a newborn's head in an ACE bandage is clearly not within the standard of care. (*Id.* at 7-8.) They further contend that Dr. Chan admitted during his testimony that he failed to follow the standard of care when treating GH.[37] (*Id.* at 8.)

As explained below, the Court finds that no reasonable jury could have found that Dr. Chan met the standard of care.

---

[37] Defendants deny that Dr. Chan admitted to breaching the standard of care. (ECF No. 91 at 5.)

-9-

### 1. Testimony at Trial

#### i. Dr. Niklas

Plaintiff's expert in pediatrics and neonatology, Dr. Niklas, testified that the standard of care for treating a subgaleal hemorrhage is to observe and, if necessary, treat with transfusions.[38] Dr. Niklas testified that this standard of care is "very clear."[39] Further, she testified that the standard of care "is not to apply an ACE bandage."[40] In fact, she testified that she did not know of a single other neonatologist in the United States who treats a subgaleal hemorrhage by wrapping a baby's head with an ACE bandage.[41] She had never even heard of any neonatologist propose using an ACE bandage to treat a subgaleal hemorrhage.[42] And, to the best of her knowledge, no textbook or peer-reviewed article recommends treating subgaleal hemorrhage by wrapping an ACE bandage around the head.[43]

#### ii. Dr. Chan

Like Dr. Niklas, Dr. Chan testified that the standard of care for treating a subgaleal hemorrhage is observation and, if necessary, transfusion.[44] Dr. Chan did not include wrapping the head with an ACE bandage in his articulation of the standard of care.[45] Dr. Chan also testified

---

[38] Testimony of Dr. Victoria Niklas, ECF No. 81 at 137-39; 152.

[39] *Id.* at 169.

[40] *Id.*

[41] *Id.* at 138.

[42] *Id.*

[43] *Id.* at 138-39.

[44] Dr. Chan testified as follows:

> Q:   And Doctor, the standard treatment in the United States for a subgaleal hemorrhage is to observe hematocrit and hemoglobin, the blood levels, and to transfuse as necessary. That is the standard treatment; correct?
>
> A:   Yes.

ECF No. 81 at 71.

[45] *See id.*

that the textbooks he considers to be reliable in the field—and that he uses to teach—do not recommend treating a subgaleal hemorrhage by applying an ACE bandage wrap.[46] In fact, he testified that no literature exists anywhere that states that the standard of care for treating a subgaleal hemorrhage is to wrap the head with an ACE bandage.[47]

Dr. Chan further testified that no clinical trials have tested his methodology for treating subgaleal hemorrhage with an ACE bandage.[48] He also stated that the neonatologists he has practiced with at Conemaugh do not treat subgaleal hemorrhage with head wraps.[49] In fact, Dr. Chan testified that, as far as he knows, he is the only doctor in the United States who treats subgaleal hemorrhage by wrapping the head with an ACE bandage.[50]

Dr. Chan testified that he learned the head-wrapping technique while in medical school in the Philippines in the 1980s.[51] He stated that he is aware of two articles that advocate using compression wraps to treat subgaleal hemorrhage.[52] But these articles are from Canada and Australia, not the Untied States.[53] Also, these articles advocate for using compression wraps—not an ACE bandage wrap like that applied by Dr. Chan.[54] Furthermore, these articles do not mention how long a compression wrap should be applied.[55] Finally, these articles acknowledge that the

---

[46] *Id.* at 70-71.
[47] *Id.* at 115.
[48] *Id.* at 93.
[49] *Id.* at 74.
[50] *Id.* at 71.
[51] *Id.* at 72-73.
[52] *Id.* at 71; 93-94.
[53] *Id.* at 71.
[54] *Id.* at 94.
[55] *Id.*

-11-

medical profession does not know if a compression wrap is actually effective at treating a subgaleal hemorrhage.[56]

### 2. The Court Did Not Err in Determining that No Reasonable Jury Could Conclude that Dr. Chan Followed the Standard of Care

Plaintiffs presented unequivocal evidence—both through Dr. Niklas's testimony and through Dr. Chan's own testimony—that the standard of care for treating a subgaleal hemorrhage is observation and, if necessary, transfusion.[57] No witness—not even Dr. Chan—testified that the standard of care involved wrapping the head with an ACE bandage. Furthermore, neither Dr. Niklas nor Dr. Chan is aware of any peer-reviewed literature that endorses this tactic, nor knows of any other doctor in the United States who treats subgaleal hemorrhage with an ACE bandage wrap.[58] Accordingly, no reasonable jury could have concluded that Dr. Chan's treatment of GH fell within the standard of care. Therefore, the Court did not err in concluding that, as a matter of law, Dr. Chan breached the standard of care.

### C. A Reasonable Jury Could Not Have Found that Dr. Chan's Treatment Did Not Cause GH's Injuries

Dr. Chan and Conemaugh next assert that a reasonable jury could have concluded that Dr. Chan's negligence did not cause GH's injuries. (ECF No. 86 at 18.) They note that Dr. Chan applied an ACE bandage on at least ten other newborns suspected of having a subgaleal hemorrhage without incident. (*Id.*) They further observe that one of Plaintiffs' experts testified that GH's cephalohematoma could have been caused by pressure caused by GH's head resting on her mother's pelvic bones during labor and delivery. (*Id.*) They argue that this testimony

---

[56] *Id.* at 71.

[57] *See id.* at 137-39; 71.

[58] *See id.* at 138-39; 71.

establishes that GH's scalp may have been damaged by a natural physical process that occurred before GH's birth, not by the ACE bandage ordered by Dr. Chan. (*Id.*)

In response, Plaintiffs contend that unrebutted testimony conclusively established that the ACE bandage was a substantial factor in causing GH's injuries. (ECF No. 88 at 9.) Plaintiffs argue that Dr. Chan's testimony corroborated the testimony offered by Plaintiffs' experts because Dr. Chan stated that when a head wrap is compressed too tightly, it can cut off blood supply, causing the skin tissue to become necrotic and die. (*Id.* at 11.) Plaintiffs further argue that Dr. Chan admitted that GH's skin showed signs of compression after the wrap was applied. (*Id.*) Plaintiffs also note that Dr. Chan failed to offer any alternative explanation for GH's injuries. (*Id.*)

As explained below, the Court finds that no reasonable jury could have concluded that the head wrap ordered by Dr. Chan did not cause GH's injuries.

## 1.    Testimony at Trial

### i.    Dr. Niklas

Dr. Niklas testified that the ACE bandage wrap was a substantial factor in causing GH's injuries.[59] Dr. Niklas stated that the major risk of wrapping a newborn's head with a tight wrap is "to compromise all of the tissues that underlie that ACE bandage," such as the scalp and skull bones.[60] Dr. Niklas testified that, though born prematurely, GH was "essentially a healthy newborn baby with good color" at birth.[61] But after the wrap was applied, GH showed numerous signs and symptoms of compression: [62] her right eye became "remarkably swollen;"[63] GH became

---

[59] ECF No. 81 at 133.
[60] *Id.*
[61] *Id.* at 143.
[62] *Id.*
[63] *Id.* at 146

irritable and inconsolable;[64] and GH's scalp showed abrasions, which oozed and drained fluid, which is "clear evidence" that the underlying tissue had been compromised and was becoming necrotic.[65] Dr. Niklas testified that the wrap "was extremely tight and was compromising the tissue causing it to break down and essentially to start dying."[66] According to Dr. Niklas, the ACE bandage wrap "led to the injuries [GH] suffered . . . and will continue to suffer for the rest of her life."[67]

### ii. Dr. Monson

Like Dr. Niklas, Dr. Monson, GH's threating physician and expert in the fields of pediatric plastic surgery and craniofacial reconstruction, testified that Dr. Chan's head wrap clearly caused GH's injuries.[68] Dr. Monson testified that "[s]hortly after birth, [GH] had a very tight wrap placed around her head circumferentially, which cut off blood supply to the skin, the scalp, the underlying tissue," and the skull bone, causing "impaired blood flow and necrosis or death of that tissue."[69]

### iii. Dr. Chan

Dr. Chan testified that he was "baffled" that GH experienced swelling, oozing, and tissue death[70] because he had previously wrapped approximately ten other babies' heads with ACE bandages and none of those babies had sustained injuries.[71] But Dr. Chan agreed that if a head

---

[64] *Id.* at 149.

[65] *Id.* at 148-150.

[66] *Id.* at 150.

[67] *Id.* at 133.

[68] ECF No. 82 at 22.

[69] *Id.*

[70] ECF No. 81 at 86.

[71] ECF No. 81 at 74.

wrap creates compression, there can be "catastrophic consequences."[72] He explained that "if you compressed it too tightly you could cut off blood supply like a tourniquet."[73] Dr. Chan further explained that if a head wrap cuts off blood flow, the tissue loses oxygen "and the tissue dies"[74] and turns black due to "necrosis."[75]

Dr. Chan testified that, if a wrap is applied too tightly, certain signs will present.[76] He stated that one of these signs is swelling in the area of the wrap.[77] Dr. Chan admitted that there is no documentation in any of the nursing records of any eye swelling prior to GH's head being wrapped.[78]And he stated that five or six hours after the wrap was placed on GH's head, GH started to develop significant swelling in the right eye.[79] In fact, her right eye was swollen shut.[80]

Dr. Chan also testified that, according to the nursing records from 8:00 p.m. on the evening of December 28—approximately 31 hours after the wrap was applied[81]—GH was irritable and inconsolable.[82] Dr. Chan testified that the nursing records from that evening also indicate that a large swollen area above the head wrapping had developed and was oozing fluid.[83] Dr. Chan explained that the scalp oozes fluid "when you have a break down" of the skin.[84]

---

[72] *Id.*
[73] *Id.* at 75.
[74] *Id.* at 75; 90.
[75] *Id.*
[76] *Id.* at 77.
[77] *Id.*
[78] *Id.* at 78.
[79] *Id.*
[80] *Id.* at 77.
[81] *Id.* at 82
[82] *Id.* at 80.
[83] *Id.* at 82.
[84] *Id.*

Dr. Chan further testified that when the wrap was removed at 10:00 a.m. on December 29, GH had bruising and abrasions on her head that required the administration of an antibiotic.[85] He also stated that the oozing from the abrasions was so bad that it stained GH's linens.[86] After the wrap was removed, Dr. Chan consulted a plastic surgeon because eschar had formed "all the way round" both sides of GH's head.[87] Dr. Chan admitted that there is no documentation of any abrasions on GH's scalp prior to the application of the wrap.[88] He also acknowledged that, when the wrap was removed, he realized that it had caused compression.[89]

### 2. The Court Did Not Err in Determining that No Reasonable Jury Could Conclude that the Head Wrap Did Not Cause GH's Injuries

No reasonable jury could have concluded that the head wrap did not cause GH's injuries. Both of Plaintiffs' experts testified that the head wrap categorically caused the injuries that GH suffered.[90] Dr. Chan—Defendants' only witness—did not offer an alternative theory of causation.[91] Rather, he stated that he was "baffled" by the injuries that appeared on GH's head and scalp after the head wrap was applied.[92] But, as noted above, he acknowledged that the injuries that GH suffered were the type of injuries that would develop if a head wrap were applied too tightly, cutting off blood flow and causing the underlying skin tissue to die.[93]

•

---

[85] *Id.* at 84.

[86] *Id.*

[87] *Id.* at 87.

[88] *Id.* at 85.

[89] *Id.* at 89.

[90] *See* ECF No. 81 at 133; ECF No. 82 at 22.

[91] *See, generally,* EECF No. 81 at 47-116.

[92] *Id.* at 86.

[93] *Id.* at 75; 90.

Given that both of Plaintiffs' experts testified unequivocally that the head wrap caused GH's injuries, that Dr. Chan offered no alternative theory of causation, and that Dr. Chan himself testified that a head wrap, if applied too tightly, could cause the exact injuries that GH suffered, the Court affirms its previous determination that no reasonable jury could have found that the head wrap did not cause GH's injuries. *See Sullivan,* 112 F. App'x at 178.

The Court rejects Defendants' argument that the Court erred in granting Plaintiffs' Motion for Judgment as a Matter of Law because Dr. Chan testified that he followed the standard of care for treating a subgaleal hemorrhage. (*See* Defendants' Brief in Support of Motion for a New Trial, ECF No. 86 at 17.) Defendants correctly point out that Dr. Chan testified that he "observed" GH and did not give her transfusions because they did not appear necessary. (Testimony of Dr. Chan, ECF No. 81 at 107). But Defendants conveniently ignore the fact that, while Dr. Chan's observation and decision not to utilize blood transfusions fell within the standard of care for treating a subgaleal hemorrhage, his decision to order a head wrap with an ace bandage clearly did not. The Court declines Defendants' invitation to insulate doctors from liability when they take actions that clearly fall outside the standard of care, simply because they also took actions that fell within the standard of care.

The Court similarly rejects Defendants' contention that the Court improperly granted Plaintiffs' Motion for Judgment as a Matter of Law because Plaintiffs' expert, Dr. Niklas, testified that GH's labor and delivery process could have caused her cephalohematoma. (*See* Defendants' Brief in Support of Motion for a New Trial, ECF No. 86 at 17.) Contrary to Defendants' characterization, Dr. Niklas did not testify that the significant scalp injuries that GH suffered could have been caused by labor and delivery. Rather, as noted above, she testified that the head

-17-

wrap caused GH's injuries.[94] The Court rejects Defendants' mischaracterization of Dr. Niklas's testimony and finds no legal error in its decision to grant Plaintiffs' Motion for Judgment as a Matter of Law.

**IV.** **The Court Will Deny Defendants' Motion for a New Trial on Damages Because Defendants Waived Any Objections to Plaintiffs' Counsel's Opening Statement and Closing Argument and Because There Is No Reasonable Probability that the Jury Was Prejudiced**

Defendants next argue that the Court should vacate the jury award and order a new trial on damages because the jury impermissibly relied on passion and prejudice in reaching its verdict. (ECF No. 86 at 10-12.) Defendants complain that during his opening statement, Plaintiffs' counsel characterized Dr. Chan's conduct as "outrageous" and "crazy." (*Id.* at 11.) They also claim that Plaintiffs' counsel improperly implored the jury to "send a message." (ECF No. 86 at 11; ECF No. 91 at 4-5.) Specifically, Defendants point to the following portion of Plaintiffs' counsel's opening statement:

> [The Plaintiffs] came to the courtroom for justice. They came to the courtroom to ask you as members of this community to tell Dr. Chan no more head wraps, to tell Dr. Chan listen to your experts, to tell Dr. Chan don't be a cowboy, do what every other neonatologist in this country does. That's why they're here.

(ECF No. 86 at 11, quoting Opening Statement of Dominic Guerrini, ECF No. 81 at 34-35.) Defendants also argue that Plaintiffs' counsel made inappropriate remarks during his closing argument by stating:

> Conemaugh thinks it's not that bad. Help them understand. You tell Conemaugh and you tell Dr. Chan it is that bad . . . Ladies and gentlemen, use your power. Tell those folks at Conemaugh it is that bad.

---

[94] ECF No. 81 at 133.

-18-

(ECF No. 91 at 4, quoting Closing Statement of Dominic Guerrini, ECF No. 80 at 23-24.) According to Defendants, these statements inflamed the jury and caused it to reach a verdict based on passion and prejudice rather than on the facts. (ECF No. 86 at 11.) They ask that the Court vacate the jury verdict and grant them a new trial.

### A. Defendants Waived Any Objection to Plaintiffs' Opening Statement and Closing Argument by Failing to Object at Trial

Defendants object to Plaintiffs' opening statement and closing argument for the first time in their Post-Trial Motion. Because their counsel failed to object at trial and because "exceptional circumstances" do not exist, the Court easily holds that Dr. Chan and Conemaugh waived any objection.

"[I]t is clear that a party who fails to object to errors at trial waives the right to complain about them following trial." *Waldorf v. Shuta*, 142 F.3d 601, 629 (3d Cir. 1998) (internal citations omitted); *Wilson v. Vermont Castings, Inc.*, 170 F.3d 391, 395 (3d Cir. 1999) (quoting *Waldorf*, 142 F.3d at 629). Particularly relevant here, "[c]ounsel's failure to object precludes him from seeking a new trial on the grounds of the impropriety of opposing counsel's closing remarks." *Murray v. Fairbanks Morse*, 610 F.2d 149, 152 (3d Cir. 1979); *see Ghee v. Marten Transp., Ltd.*, 570 F. App'x 228, 231 (3d Cir. 2014) (affirming district court's denial of motion for a new trial because "the request for a new trial could not have rested on an objection that the defendants wholly failed to lodge."); *see also Bernard v. E. Stroudsburg Univ.*, No. 3:09-CV-0Q525, 2016 WL 755486, at *27 (M.D. Pa. Feb. 24, 2016), *aff'd*, 700 F. App'x 159 (3d Cir. 2017) (quoting *Murray*, 610 F.2d at 149) (denying motion for a new trial on ground that the court improperly precluded plaintiff's rebuttal testimony when plaintiff stated at trial that he agreed with court's decision not to allow rebuttal testimony, and

therefore waived any objection); *Wright v. Cacciutti*, No. 3:12-CV-1682, 2015 WL 3654553, at *16 (M.D. Pa. June 11, 2015) (quoting *Murray*, 610 F.2d 149) (denying motion for a new trial when defendants failed to object to verdict sheet during charging conference). However, a court may review a waived issue "under exceptional circumstances." *Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 116 (3d Cir. 1992). "Exceptional circumstances arise when 'the public interest requires that the issue[s] be heard or when a manifest injustice would result from the failure to consider the new issue[s].'" *Simpson v. Nicklas*, 500 F. App'x 185, 187 (3d Cir. 2012) (internal citation marks omitted) (quoting *United States v. Anthony Dell'Aquilla, Enters. & Subsidiaries*, 150 F.3d 329, 335 (3d Cir. 1998)).

Defendants waived any objection to Plaintiffs' counsel's statements based upon Defense Counsel failing to object to Plaintiffs' opening statement or closing argument during the trial. Therefore, Defendants waived any objection absent "exceptional circumstances." *Murray*, 610 F.2d at 152; *Ghee*, 570 F. App'x at 231. Additionally, Dr. Chan and Conemaugh have failed to demonstrate that this case presents "exceptional circumstances" that would permit the Court to consider an issue that they waived at trial. In fact, Dr. Chan and Conemaugh do not even argue that "exceptional circumstances" exist.

After reviewing the transcript, the Court concludes that "exceptional circumstances" are not present. Manifest injustice would not result from a finding that Dr. Chan and Conemaugh waived an objection to Plaintiffs' opening statement and closing argument because, when considered in the context of Plaintiffs' entire opening statement, closing statement, and this Court's limiting instructions, it is extremely unlikely that the passages identified by Defendants improperly influenced the jury. Therefore, the Court holds that Defendants waived any objection

to Plaintiffs' opening statement and closing argument and denies their Motion for a New Trial on this ground.

**B.    Additionally, and in the Alternative, Plaintiffs' Counsel's Opening Statement and Closing Argument Were Not Sufficiently Prejudicial to Warrant a New Trial**

Even if Defendants had not waived their objection to Plaintiffs' opening statement and closing argument, the Court would still deny their Motion for a New Trial on this basis for two reasons. First, Plaintiffs' counsel did not explicitly ask the jury to "send a message" to Dr. Chan and Conemaugh. (*See* ECF No. 81 at 34-35.) Second, even if the Court construed Plaintiffs' counsel as having asked the jury to "send a message" in his opening statement or closing argument, these isolated statements still would not be sufficiently prejudicial to warrant a new trial because, when considered in the context of Plaintiffs' counsel's entire opening statement and closing argument, it is not "reasonably probable" that the few sentences identified by Dr. Chan and Conemaugh prejudiced the jury.

"[N]ot all improper remarks will engender sufficient prejudice to mandate the granting of a new trial. Our test is whether the improper assertions have made it 'reasonably probable' that the verdict was influenced by prejudicial statements." *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 207 (3d Cir. 1992) (quoting *Draper v. Airco, Inc.*, 580 F.2d 91, 97 (3d Cir. 1978)); *Waldorf*, 142 F.3d at 628 (quoting *Fineman*, 980 F.2d at 207); *Vandenbraak v. Alfieri*, 209 F. App'x 185, 189 (3d Cir. 2006) (articulating same standard for a new trial based on counsel's improper statements). "Rather than reviewing for 'a single instance of impropriety,'" courts consider "the argument as a whole" when determining whether it is "reasonably probable" that counsel's remarks prejudiced the jury. *Vandenbraak*, 209 F. App'x at 189 (quoting *Fineman*, 980 F.2d at 208).

There is no "per se rule against invitations to a jury to 'send a message.'" *Burlington v. News Corp.*, No. CV 09-1908, 2016 WL 1221426, at *9 (E.D. Pa. Mar. 29, 2016) (citing *Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 364 (3d Cir. 1999)). In fact, several courts in the Third Circuit have rejected the exact argument that Dr. Chan and Conemaugh make here—that an attorney's statement that the jury should "send a message" in a non-punitive damages case is sufficiently prejudicial to warrant a new trial. *See Greenleaf*, 174 F.3d at 364 (affirming district court's denial of motion for a new trial when an attorney asked the jury to "send a message" to the defendants); *Burlington*, 2016 WL 1221426, at * 9 (denying motion for a new trial when attorney told jury to "send a message" by returning a verdict against a civil plaintiff); *Crosby v. State Corr. Inst. at Greensburg*, No. CIV.A. 08-1506, 2011 WL 284098, at *3 (W.D. Pa. Jan. 25, 2011) (Ambrose, J.) (denying motion for a new trial when plaintiff's attorney implored jury to "send a message" by returning a plaintiff verdict).

After reviewing the transcript and considering the entire opening statement and closing argument, the Court holds that it is not "reasonably probable" that Plaintiffs' counsel's statements prejudiced the jury. Plaintiffs' counsel did not ask the jury to "punish" Dr. Chan and Conemaugh, never requested punitive damages, and never explicitly asked the jury to "send a message." And even if the Court construed the passages that Dr. Chan and Conemaugh identify as an implicit appeal to "send a message" to the Defendants, a new trial still would not be warranted. When considered in the context of Plaintiffs' entire opening statement and closing argument, it is not "reasonably probable" that the statements influenced the jury. Therefore, a new trial is not warranted. *Vandenbraak*, 209 F. App'x at 189; *Fineman*, 980 F.2d at 208.

C. **Defendants Are Not Entitled to a New Trial Based on Alleged Errors in the Verdict Slip**

Dr. Chan and Conemaugh complain for the first time in their Post-Trial Motion that the verdict slip prejudiced them because it did not distinguish between Dr. Chan and Conemaugh and did not allocate liability between the five Defendants originally listed in the caption. (ECF No. 86 at 18.) But when the Court asked Defense Counsel at the charging conference whether he approved of the final verdict slip, he replied, "Yes, your Honor." (ECF No. 82 at 129, lines 10-14.) Therefore, Defendants waived any objection to the verdict slip. *Waldorf*, 142 F.3d at 629.

Defendants' argument misses the mark for another reason: Conemaugh is vicariously liable for Dr. Chan's negligence. Under Pennsylvania law, "[t]he corporation, as principal, assumes the risk of individual agents' negligence under the theory of vicarious liability." *Scampone v. Highland Park Care Ctr., LLC*, 57 A.3d 582, 597–98 (Pa. 2012) (citing *Iandiorio v. Kriss & Senko Enters., Inc.*, 517 A.2d 530 (Pa. 1986)). "Vicarious liability, sometimes referred to as imputed negligence, means in its simplest form that, by reason of some relation existing between A and B, the negligence of A is to be charged against B although B has played no part in it . . . ." *Id.* at 597. "Once the requisite relationship (i.e., employment, agency) is demonstrated, 'the innocent victim has recourse against the principal,' even if 'the ultimately responsible agent is unavailable or lacks the ability to pay.'" *Id.* (quoting *Mamalis v. Atlas Van Lines, Inc.*, 560 A.2d 1380, 1383 (Pa. 1989)).

Dr. Chan treated GH in his capacity as the director of the neonatal intensive care unit at Conemaugh.[95] Therefore, Conemaugh is vicariously liable for Dr. Chan's negligence. *Id.*

---

[95] Testimony of Dr. Chan, ECF No. 81 at 51-52.

## V. The Court Will Grant Defendants' Motion for Remittitur Because the Jury Verdict Shocks the Conscience

Finally, Defendants argue that the Court should remit the $43,750,000 compensatory damage award because it shocks the conscience. (ECF No. 86 at 4-14; ECF No. 91 at 2-3.) Defendants assert that comparing this compensatory damage award with awards rendered in similar cases establishes that the jury rendered an excessive verdict. (ECF No. 86 at 6-10.) Defendants also emphasize that GH did not suffer brain damage, cognitive impairments, or developmental delays. (*Id.* at 12-14.) In response, Plaintiffs argue that the jury rendered an appropriate verdict given the extent and severity of GH's injuries. (ECF No. 88 at 15-22.) Plaintiffs also argue that the Court should not compare verdicts when evaluating Defendants' Motion for Remittitur because GH's young age, unique injuries, and idiosyncratic individual characteristics defy any attempts to compare her to other plaintiffs. (*Id.* at 24.)

### A. Remittitur: Background and Legal Standard

#### 1. Remittitur: A Brief History

As one commentator has noted, "[a]uthorities agree that the use in the United States federal courts of the remittitur procedure was initiated by Mr. Justice Story, while sitting on circuit, in the case of *Blunt v. Little*."[96] In *Blunt*, the jury found that the plaintiff had been maliciously arrested and awarded him $2,000. *Blunt v. Little*, 3 F. Cas. 760, 761 (C.C.D. Mass. 1822). The defendant moved for a new trial on various grounds, one of which was that the jury verdict was excessive. *Id.* Justice Story agreed that the jury awarded an excessive verdict. *Id.* Citing two

---

[96] Irene Deaville Sann, *Remittiturs (and Additurs) in the Federal Courts: An Evaluation with Suggested Alternatives*, 38 Case W. Res. L. Rev. 157, 169 (1987); *see also* Irene Sann, *Remittitur Practice in the Federal Courts*, 76 Colum. L. Rev. 299, 300 (1976).

English cases, Justice Story held that "the court may grant a new trial for excessive damages." *Id.* But Justice Story did not simply order a new trial. *Id.* Instead, he made plaintiff an offer: remit $500 of the jury award *or* proceed to a new trial. *Id.*

Justice Story appears to have acknowledged the tenuous legal basis for his innovative solution—he admitted that his decision approached "the very limits of the law." *Id.* Nevertheless, in the century after *Blunt*, the United States Supreme Court repeatedly upheld remittitur, often mentioning the procedure in passing while apparently assuming its constitutionality. *See, e.g., Gila Valley, G. & N. Ry. Co. v. Hall*, 232 U.S. 94, 104 (1914); *Koenigsberger v. Richmond Silver Min. Co.*, 158 U.S. 41, 46 (1895); *Arkansas Valley Land & Cattle Co. v. Mann*, 130 U.S. 69, 75 (1889); *N. Pac. R. Co. v. Herbert*, 116 U.S. 642, 643 (1886).

The Supreme Court's first thorough examination of remittitur came in 1935 in *Dimick v. Schiedt*, 293 U.S. 474 (1935). The Court criticized Justice Story's opinion in *Blunt*—and the Court's prior jurisprudence—for failing to examine the English common-law which decisively rejected the practice of remittitur. *Id.* at 484.[97] The Court speculated that "if the question of remittitur were now before us for the first time, it would be decided otherwise." *Id.* However, the Court upheld remittitur, reluctant to disturb a practice that "has been accepted as the law for more than a hundred years and uniformly applied in the federal courts during that time." *Id.*

To this Court's best knowledge, the Supreme Court has never again directly confronted the constitutional issue posed by remittitur.[98]

---

[97] The Supreme Court observed that the practice of remittitur "has been condemned as opposed to the principles of the common law by every reasoned English decision, both before and after the adoption of the Federal Constitution." *Dimick*, 293 U.S. at 484.

[98] *See* Sann, *Remittitur Practice, supra*, at 301.

### 2.     Remittitur: Legal Standard

"[R]emittitur is well established as a device employed when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive." *Cortez*, 617 F.3d at 715 (quoting *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir. 1986)); *Dee*, 474 F. App'x at 87. "Federal law governs the question whether a remittitur should be granted in diversity actions." *Kazan v. Wolinski*, 721 F.2d 911, 913 (3d Cir. 1983) (citing *Donovan v. Penn Shipping Co.*, 429 U.S. 648, 649 (1976)).

"[T]he court may not vacate or reduce the award merely because it would have granted a lesser amount of damages." *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir. 1989). The district court may only disturb a jury verdict if "the damages assessed by the jury [are] so unreasonable as to offend the conscience of the Court." *Id.* (internal quotation marks omitted) (quoting *Murray*, 610 F.2d at 152); *Keenan v. City of Philadelphia*, 983 F.2d 459, 469 (3d Cir. 1992) (quoting *Gumbs v. Pueblo Int'l Inc.*, 823 F.2d 768, 771 (3d Cir. 1987)) (holding that a court may remit only if verdict is "so grossly excessive as to shock the judicial conscience."). If the Court remits, "[t]he reduction may not be less than the maximum amount that does not 'shock the judicial conscience.'" *Dee*, 474 F. App'x at 87 (quoting *Evans*, 273 F.3d at 355); *see also Kazan*, 721 F.2d at 914.

A district judge that remits must offer the plaintiff the option of a new trial. *Cortez*, 617 F.3d at 716. This is because "the choice between a reduced award and a new trial is required by the Seventh Amendment, and a court cannot reduce an award without affording the plaintiff the option of a new trial." *Cortez*, 617 F.3d at 717 (citing *Hetzel v. Prince William Cty., Va.*, 523 U.S. 208, 211 (1998)); *see also Dee*, 474 F. App'x at 87.

A plaintiff cannot challenge a remittitur to which he or she has agreed. *Cortez*, 617 F.3d at 717 (holding that plaintiff could not challenge the remittitur she accepted despite the "dilemma" she found herself in after jury in first trial returned a large punitive damage award that plaintiff might not obtain again in second trial); *Donovan*, 429 U.S. at 650 ("a plaintiff in federal court, whether prosecuting a state or federal cause of action, may not appeal from a remittitur order he has accepted.").

If the Court believes that "the jury verdict resulted from passion or prejudice, a new trial, rather than a remittitur, [is] the proper remedy." *Dunn v. HOVIC*, 1 F.3d 1371, 1383 (3d Cir. 1993). However, "the size of the award alone [is not] enough to prove prejudice and passion." *Evans*, 273 F.3d at 352 (internal quotation marks omitted) (affirming district court's denial of motion for a new trial when district court remitted $640,000 of a $1,150,000 jury verdict.) "If the award is excessive, but did not result from passion or prejudice, remittitur . . . is the proper remedy." *Marcus v. PQ Corp.*, 458 F. App'x 207, 213 (3d Cir. 2012) (citing *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 114 (3d Cir. 1999)). The Third Circuit "review[s] for abuse of discretion the decision not to grant a new trial requested because of jury passion and prejudice." *Id.* at 210. (citing *Evans*, 273 F.3d at 351-52.)

"The trial judge's decision to grant or withhold a remittitur cannot be disturbed absent a manifest abuse of discretion." *Smith v. Katz*, 696 F. App'x 582, 591 (3d Cir. 2017) (internal quotation marks omitted) (quoting *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1100 (3d Cir. 1995)). The Third Circuit explains that this deference stems from the fact that "[t]he district judge is in the best position to evaluate the evidence presented and determine whether or not the jury has come to a rationally based conclusion." *Smith*, 696 F. App'x at 591 (quoting *Spence*, 806 F.2d at

1201). Accordingly, the Third Circuit's "role in reviewing the District Court's decision to remit the damage award . . . is 'severely limited.'" *Smith*, 696 F. App'x at 591 (quoting *Evans*, 273 F.3d at 354). Furthermore, as the Third Circuit has repeatedly stated, it "must give the benefit of every doubt to the judgment of the trial judge" when reviewing a decision to remit a jury award. *Smith*, 696 F. App'x at 591 (quoting *Evans*, 273 F.3d at 354). However, if the Third Circuit determines that even after remittitur the award still has no reasonable basis, the Third Circuit may order further remittitur. *See Dunn*, 1 F.3d at 1383 (reducing $2,000,000 punitive damage award to $1,000,000 after trial court originally granted remittitur and reduced it from $25,000,000 to $2,000,000).

### B. Compensatory Damages: Legal Standard

"Compensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). "Damages for pain and suffering are compensatory in nature, may not be arbitrary, speculative, or punitive, and must be reasonable." *Haines v. Raven Arms*, 640 A.2d 367, 370 (Pa. 1994). Translating pain and suffering into a monetary figure is a "highly subjective task . . . ." *Id.* However, "the verdict resulting from this subjective task still requires support in the evidence presented at trial." *Polett v. Pub. Commc'ns, Inc.*, No. 80 EDA 2017, 2017 WL 6395873, at *2 (Pa. Super. Ct. Dec. 15, 2017); *see Neison v. Hines*, 653 A.2d 634, 637 (Pa. 1995) (quoting *Paves v. Corson*, 801 A.2d 546, 549 (Pa. 2002)) ("[A] compensatory damage award 'must bear some reasonable relation to the loss suffered by the plaintiff as demonstrated by uncontroverted evidence at trial.'").

## C. GH's Injuries

GH suffered serious injuries that have required, and will continue to necessitate, extensive medical treatment and, at a time in the future, psychological counseling. However, Plaintiffs did not present any evidence that GH suffered brain damage, developmental delays, or other cognitive issues. (Testimony of Dr. Monson, ECF No. 82 at 59; testimony of Corradina Baldacchino, ECF No. 82. at 100). Dr. Chan's negligence did not decrease GH's life expectancy. (Testimony of Dr. Monson, ECF No. 82 at 59.) While GH's head is significantly disfigured because of the tissue expander and will ultimately become even more disfigured when the second tissue expander is inserted, the tissue expanders are temporary—when they are removed, she will not have any bumps on her head. (*Id.* at 70-71.) Currently, GH's daily treatment "is just good hygiene and moisturizing of the skin." (*Id.* at 53.) And despite GH's ongoing medical issues, she is part of a "happy family" and is otherwise a "healthy little girl." (Testimony of Ian Harker, ECF No. 82 at 77; Testimony of Corradina Baldacchino, ECF No. 82, 100.)

## D. The Jury Award Shocks the Conscience

As explained below, the Court finds that the $43,750,000 compensatory damage award is unsupported by the evidence and shocks the judicial conscience.[99]

---

[99] As noted above in Part IV, after reviewing the transcript and considering the trial proceedings as a whole, the Court finds that it is not reasonably probable that the jury's verdict resulted from passion or prejudice. The large jury award does not, by itself, prove that the jury improperly acted on passion or prejudice in reaching its verdict. *Evans*, 273 F.3d at 352. And, as explained above, Dr. Chan and Conemaugh failed to establish that the jury was motivated by passion or prejudice. Therefore, a new trial is not warranted on this ground. *Marcus*, 458 F. App'x at 213; *Hurley*, 174 F.3d at 114. But, as explained below, the jury award shocks the conscience, warranting remittitur.

### 1. The $43,750,000 Compensatory Damage Award Is Grossly Excessive and Unsupported by the Evidence

Despite GH's severe physical injuries which will require future operations and medical treatment, her permanent disfigurement, and the high likelihood of future emotional damage necessitating counseling,[100] her injuries by no means justify the $43,750,000 compensatory damage award that the jury rendered. While she will never grow hair on certain parts of her head and will have permanent scarring, she will be significantly less disfigured once the tissue expanders are removed and she will not have any permanent bumps on her head. Furthermore, GH did not suffer any brain injuries, developmental delays, or cognitive impairments. Without diminishing the severity of GH's injuries, the Court finds that the evidence presented at trial simply cannot justify the $43,750,000 compensatory damage award.

### 2. Comparable Cases Further Support the Court's Conclusion that the Compensatory Damage Award Shocks the Conscience

"[C]ases involving similar injuries" may serve as "helpful guide[s] to determine whether a particular award is excessive." *Motter*, 883 F.2d at 1230 (citing *Nairn v. Nat'l R.R. Passenger Corp.*, 837 F.2d 565, 568 (2d Cir. 1988)); *Gumbs*, 823 F.2d at 773 (examining "verdicts with comparable injuries offers us some guidelines" when determining whether a particular award is excessive); *Evans*, 273 F.3d at 356 (stating that district courts may "consider similar cases [when] evaluat[ing] the evidence and determin[ing] a damages figure that [is] rationally related to [that] evidence . . . .") (internal citations omitted); *Borrell v. Bloomsburg Univ.*, 207 F. Supp. 3d 454, 471 (M.D. Pa. 2016) (citing *Evans*, 273 F.3d at 356). District courts may look to decisions of other circuits to assess

---

[100] *See* Section II, *supra*.

whether an award shocks the conscience. *See Williams v. Martin Marietta Alumina, Inc.,* 817 F.2d

1030, 1040 (3d Cir. 1987); *Blakey v. Cont'l Airlines, Inc.,* 992 F. Supp. 731, 736 (D. N.J. 1998) (citing

*Williams,* 817 F.2d at 1040).

    While this Court may examine other awards, it must remain "mindful that each verdict

revolves around a unique set of facts and circumstances." *Motter,* 883 F.2d at 1230; *Troy v. Nat'l*

*R.R. Passenger Corp.,* No. CIV. A. 94–3943, 1995 WL 450276, at \*5 (E.D. Pa. July 27, 1995) (same);

*Swiatek v. Bemis Co., Inc.,* Civ. No. 08-6081, 2014 WL 12614494, at \*2 (D. N.J. Jan. 24, 2014) (same).

As one district court eloquently explained:

> The severity of an individual plaintiff's injury, the manner in which that plaintiff
> experiences pain and suffering, and the anticipated span of time during which
> plaintiff can be expected to experience the pain and suffering are all individual
> factors that greatly complicate an attempt to compare the bottom-line verdicts in
> different cases.

*Maylie v. Nat'l R.R. Passenger Corp.,* 791 F. Supp. 477, 482–83 (E.D. Pa. Apr. 15, 1992).

    Despite these inherent limitations in comparing damage awards, the Court finds it useful

to compare the extremely large compensatory damage award rendered in this case with awards

in comparable cases. This Court has diligently researched verdicts from across the country, but

has failed to identify a single case with substantially similar facts to this one. But the Court located

numerous cases with fact patterns that—while not perfectly analogous—provide a helpful

context for evaluating the jury award rendered here.

    Juries and judges in cases with comparable injuries awarded considerably less in non-

economic damages than the jury in this case.[101] *See, e.g., Ocampo v. Paper Converting Mach. Co.,* No.

---

[101] The Court recognizes that some of these awards were rendered some time ago. These verdicts would
likely be higher if they were awarded today because of inflation. The Court considered this likely increase
when comparing these past awards to the award rendered in this case.

02 C 4054, 2005 WL 2007144, at *5 (N.D. Ill. Aug. 12, 2005) (jury awarded $6,600,000, comprised of approximately $6,000,000 in pain and suffering damages, for woman whose scalp was completely torn off, and who lost an ear, when her hair became caught in a machine; woman needed numerous corrective surgeries and developed PTSD); *Thomas C. Egan, guardian ad litem for Emmitt Lee v. Harold Koller, et al.*, No. 03-17562, 2006 WL 4007277 (Pa. Ct. Com. Pl. Nov. 9, 2006) (jury awarded $20,000,000, including nearly $17,700,000 in non-economic damages, when negligent failure to diagnose and treat new-born left child permanently blind); *Late v. United States*, Civ. No. 1:13-CV-0756, 2017 WL 1405282 (M.D. Pa. Apr. 20, 2017) (Rambo, J.) (following a bench trial, Judge Rambo awarded $42,000,000, comprised of approximately $5,000,000 for pain and suffering, when traumatic birth procedure caused permanent cognitive and physical disabilities that prevented child from being able to speak, read, or write, and child will need to be institutionalized as an adult; child underwent six surgeries and will likely require more surgeries in the future); *Nicholson-Upsey v. Touey*, No. 09-4525, 2012 WL 3067501 (Pa. Ct. Com. Pl. May 4, 2012) (jury awarded approximately $78,000,000, including approximately $10,000,000 for pain and suffering, when negligent birth caused severe brain injury that resulted in child developing quadriplegic cerebral palsy); *Hoffer v. Trs. of the Univ. of Pennsylvania*, No. 05-010406, 2012 WL 6859344 (Pa. Ct. Com. Pl., Nov. 14, 2012) (jury awarded $12,600,000, including $3,000,000 for pain and suffering, when baby sustained permanent brain damage and developed cerebral palsy due to brain injury sustained during negligent birth); *Smith v. Women for Women, et al.*, No. 00-11-1336, 2003 WL 26455587 (Pa. Ct. Com. Pl., Feb. 7, 2003) (jury awarded approximately $24,000,000, including $6,250,000 in pain and suffering, when mother suffered uterine rupture, causing oxygen deprivation to fetus that caused cerebral palsy; child is legally blind, cannot

speak, and eats from a feeding tube); *Welker v. Carnevale, et al.*, No. 3:14CV00149, 2017 WL 1046038 (W.D. Pa. Jan. 27, 2017) (jury awarded $14,800,000, including $2,000,000 in pain and suffering, when child developed spastic tetraparesis cerebral palsy and permanent cognitive deficits due to brain injury sustained because of negligent birth; child will require 24-hour care for rest of his life).[102]

Reviewing the compensatory damage awards rendered in these cases clearly confirms that the jury award in this case far exceeded the highest amount that would have reasonably compensated GH for her injuries. The highest non-economic damage award in a comparable case totaled $17,700,000,[103] significantly less than half of the amount the jury awarded for compensatory damages here. Further, the plaintiffs whose injuries most closely resemble those sustained by GH—plaintiffs who sustained severe injuries to their scalps—received substantially

---

[102] The Court also examined comparable cases where the damage awards did not distinguish between non-economic and economic damages. The plaintiffs in these cases also unvaryingly received smaller overall awards than the $43,750,000 compensatory damage award rendered in this case. *See, e.g., Elfont v. Wyeth Pharmaceuticals*, No. 04-00924, 2011 WL 7478476 (Pa. Ct. Com. Pl. Dec. 6, 2011) (jury awarded three plaintiffs $27,850,000, $24,750,000, and $20,000,00, respectively, when defective hormone replacement medication caused them to develop breast cancer); *Macholl v. Samuel J. Garfield MD PC*, No. 98-0294, 2002 WL 34696045 (Pa. Ct. Com. Pl., Mar. 21, 2002) (jury awarded $11,100,000 when baby was born with spastic quadriplegia, cerebral palsy, and cognitive deficits after doctors negligently fail to perform caesarian section during prolonged labor); *Laura White and Daniel S. White, individually and as parents and guardians of Cody White, a minor v. Richard Behlke, M.D., OB/GYN Consultants Ltd., and Cmty. Med. Ctr.*, No. 03 CV 2663, 2008 WL 5455809 (Pa. Ct. Com. Pl., Nov. 17, 2008) (jury awarded $20,500,000 when baby developed cerebral palsy, mental retardation, and cortical blindness due to negligent delivery); *Gallagher v. Temple Univ. Hosp.*, No. 00-2643, 2003 WL 26070616 (Pa. Ct. Com. Pl., Oc. 24, 2003) (jury awarded approximately $20,000,000 when hospital staff negligently failed to respond to alarms indicating that patient's tracheotomy had clogged, causing patient to sustain permanent brain damage due to oxygen deprivation; patient would never live alone or hold a job, and required personal care for the rest of his life); *Li Xian v Tat Lee Supplies Co., Inc.*, 2011 N.Y. Misc. LEXIS 7256 (Supreme Court of New York, Bronx County, Nov. 17, 2011) (judge awarded $6,000,000 to plaintiff who was assaulted by hammer-wielding man, resulting in hemorrhage, brain damage, skull fractures and lacerations to his head and hands; plaintiff underwent six surgeries and was treated with tissue expander to help extend scalp).

[103] *See Koller*, 2006 WL 4007277.

smaller jury awards than the jury awarded in this case. *See Ocampo*, 2005 WL 2007144 (jury awards $6,000,000 for pain and suffering); *Li Xian*, 2011 N.Y. Misc. LEXIS 7256 (judge awards total of $6,000,000, does not differentiate between economic and non-economic damages).

None of these cases is perfectly analogous to the case before the Court. However, the extreme disparity between awards in comparable cases and the verdict delivered here establishes that the jury's award in this case was grossly excessive and confirms the Court's finding that the $43,750,000 compensatory damage award shocks the conscience.

3.     **The Court Will Remit the Compensatory Damage Award by $27,750,000 to $16,000,000 Because $16,000,000 Is the Highest Amount that the Jury Could Have Awarded that Does Not Shock the Conscience**

After exhaustively researching the relevant case law, analyzing numerous comparator cases, thoroughly reviewing the record, and carefully considering the unique facts of this case, the Court concludes that the highest possible compensatory damage award that would not "shock the judicial conscience" is $16,000,000. Accordingly, the Court will remit $27,750,000 of the $43,750,000 compensatory damage award. *Dee*, 474 F. App'x at 88; *Evans*, 273 F.3d at 355.

The Court will not disturb the stipulated award for economic damages of $3,283,579. Accordingly, after the remittitur, the new total award is $19,283,579.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IAN HARKER, CORRANDINA )
BALDACCHINO, and GH, a minor, )          CIVIL ACTION NO. 3:15-CV-277
                              )
            Plaintiffs,       )
                              )          JUDGE KIM R. GIBSON
    v.                        )
                              )
JOHN O. CHAN, M.D., CONEMAUGH )
MEMORIAL MEDICAL CENTER,      )
                              )
                              )
            Defendants.       )

## ORDER

**AND NOW**, this 27th day of July, 2018, upon consideration of the Defendants' Motion for

Post-Trial Relief (ECF No. 77), and for the reasons set forth in the accompanying memorandum,

**IT IS HEREBY ORDERED** that Defendants' Motion is **GRANTED in PART and DENIED in**

**PART as follows:**

1. The motion is **DENIED** with respect to Defendants' motion for a new trial.

2. The motion is **GRANTED** with respect to Defendants' motion for remittitur. The
   Court **HEREBY REMITS $27,750,000 of the jury's $43,750,000 compensatory**
   **damage award, for a post-remittitur compensatory damage award of $16,000,000.**
   **The Court does <u>not</u> disturb the stipulated economic damage award of $3,283,579.**
   **Accordingly, the <u>final award</u> following remittitur is $19,283,579**.

3. The Plaintiffs have **<u>fourteen days</u>** from the date of this order to accept or reject the
   remitted verdict. Plaintiffs must docket their decision via CM-ECF. If the Plaintiffs
   reject the remitted verdict, the Court will schedule a new trial on damages.

4. Additionally, Plaintiffs' Motion for Delay Damages (ECF No. 76) is **DENIED as MOOT** because said motion is based off of the pre-remittitur verdict figure. If Plaintiffs accept the remitted award, they shall have **seven days** from the date of that acceptance to file a renewed motion for delay damages.

**BY THE COURT**

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**